COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Beales and Senior Judge Willis


SHEILA DATTA

MEMORANDUM OPINION[*]

v.      Record No. 0293-06-4                                     PER CURIAM
                                                                  AUGUST 22, 2006
FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael P. McWeeny, Judge

(Gary M. Greenbaum, on briefs), for appellant.[1]

(David P. Bobzien, County Attorney; Peter D. Andreoli, Jr., Deputy
County Attorney; Dennis R. Bates, Senior Assistant County
Attorney; May S. Kheder, Assistant County Attorney, on brief), for
appellee.

(Kathryn A. K. Untiedt, on brief), Guardian *ad litem* for the infant child.


        Sheila Datta appeals a decision of the trial court finding her child, C.D., was neglected

pursuant to Code § 16.1-228(5) and ordering that custody of C.D. remain with the Fairfax County

Department of Family Services (DFS).  On appeal, Datta contends the trial court erred by finding

she had a "mental incapacity."  Datta also argues the trial court erred by finding C.D. was "without

parental care or guardianship."  Upon reviewing the record and briefs of the parties,[2] we conclude

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Michael Scheu, father of the minor child, filed a brief in this case.  However, he is not a
party in the appeal and he has not complied with Rule 5A:23 to file a brief *amicus curiae*.
Therefore, we do not consider his brief.

[2] The Court has considered appellee's motion to dismiss this appeal and appellant's
response, and the motion to dismiss is denied.

this appeal is without merit. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

## Background

C.D. came into foster care at the age of three months. Prior to that time, he had lived with Datta in a single room she rented in a house. C.D.'s father, Michael Scheu, lived elsewhere, but he assisted Datta with living expenses. The residence was in disarray. Datta, who was not employed at the time, informed Child Protective Services (CPS) employees that she did not have "the energy" to clean the room. On one occasion, a CPS worker removed several bags of trash from the room, including dirty diapers, food, and empty food containers. Datta was guarded with the CPS workers, and she often looked over her shoulder while they were present. She was resistant to the involvement of DFS in her life, and she claimed she did not need their help. CPS arranged for a psychological evaluation, assisted her with organizing the room, and helped her with parenting skills. The case was transferred to the Family Intervention Resource and Engagement Program (FIRE), an organization which could provide more intensive home-based services to Datta.

Katya Ceneceros, a FIRE social worker, testified Datta's room was so cluttered it was difficult to walk in the room. Clothes, shoes, diapers, empty bowls, cans, and dishes containing food were scattered on the floor. The crib was full of items, and C.D., who was less than eight weeks old at the time, slept in a double bed with Datta. On several visits to Datta's residence, social workers noted that C.D.'s diaper needed to be changed and they advised Datta to change the diaper.

Ceneceros testified that Datta initially refused services from FIRE. She then agreed to accept transportation assistance for medical and psychiatric appointments. On two occasions, Ceneceros observed Datta behave as if she was talking to someone who was not present. Datta also told Ceneceros that she was not taking her prescribed psychiatric medication because she was

nursing C.D. Ceneceros testified that Datta slept long hours and sometimes did not answer the door when Ceneceros arrived for an appointment.

Ceneceros stated that FIRE is a voluntary program, but they have written contracts with clients which include specified goals. Datta refused to sign a contract with FIRE containing the goals of complying with psychiatric medication and treatment and providing a clean environment for C.D.

On June 2, 2005, an incident took place which precipitated the removal of C.D. from Datta's custody. At about midnight, Datta took a taxicab to the home of Scheu. She exited the cab in the driveway and yelled, "If you or your sister come anywhere near [C.D.] I'll slit your fucking throats." C.D. remained unattended in the cab during the incident. There were also allegations that Datta threw a beer bottle during the episode.

Scheu testified that he met Datta while they were patients at a mental health institution. After they were released from the institution, Datta told Scheu she believed people stalked her and she often contacted the police to report stalkers. Scheu testified he never noticed anyone following Datta. Scheu also stated Datta left threatening and rambling phone messages for him.

DFS removed C.D. from Datta's custody on June 3, 2005. When the social worker retrieved C.D., his diaper was soaked with urine and the room contained numerous dirty diapers and opened, old food. Datta denied to DFS that she had threatened Scheu and his sister on June 2, 2005. Later in June 2005, Jennifer Roberts, a social worker with DFS, began to work with Datta. Datta was unable to tell Roberts the psycho-effective disorder with which she had been diagnosed or when she had last had a psychological evaluation.

Between June 2005 and January 2006, Datta had seven visits with C.D. Roberts supervised these visits. Roberts stated that Datta was not "appropriate" with C.D. and she was unable to meet his needs during the visits. Roberts testified Datta did not appear to know what to do when C.D.

became "fussy" and Datta would get "very frazzled." On one visit, Datta appeared to have a conversation with an imaginary person.

Roberts stated that Datta was "very resistant" to talking with her, was "very uncooperative," and told Roberts she would not follow "any of the court rules." On one occasion, Datta threatened to "hurt" Roberts if she did not stop talking and Datta "lunged" at Roberts. Datta left numerous "rambling" phone messages for Roberts, including one in which she said she would not "do anything" Roberts asked her to do. Roberts was unable to establish a routine visitation schedule with Datta and C.D. Roberts could not locate Datta at times to schedule visitation with C.D. Datta signed, but then revoked, a release for Roberts to speak with Datta's psychiatrist. Roberts was unable to make a referral for Datta's court-ordered psychological evaluation and her parent/child assessment because Datta would not sign the appropriate release documents. Datta did not appear for several evaluation appointments.

In August 2005, Datta was evicted from her residence for failing to pay the rent. At the time of the trial court hearing, she was in detention awaiting trial for an assault charge. Datta had not been employed since giving birth to C.D., and she testified she was exhausted from caring for C.D. during the twelve weeks she had custody of the child. She denied that she previously threatened Scheu or Roberts. She blamed many of the circumstances in her life on Scheu and others. Datta also stated that after her release from jail, she planned to receive help from a church, live in a motel, and move to New York with C.D., although she had no friends or relatives there. Datta testified she had been prescribed an anti-depressant medication, but she was not receiving it while she was in detention. She also admitted she had a prior conviction for assault.

The evidence showed that C.D. was in good health while under Datta's care. He was also doing well in foster care. C.D.'s guardian *ad litem* (GAL) asserted that this was a neglect, rather than an abuse, case. The GAL argued that due to Datta's mental incapacity, Datta was unable to

have custody of C.D. The GAL cited Datta's pattern of past violence, her denial of responsibility for her circumstances, her hallucinations, and the family's living conditions as the bases for her position.

The trial judge found there was "clear evidence of a difficulty with [Datta's] mental incapacity" and evidence of neglect pursuant to Code § 16.1-228(5). He ordered that custody of C.D. remain with DFS.

Analysis

On appeal, we view the evidence and all the reasonable inferences in the light most favorable to DFS as the party prevailing below. See McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990).

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). On appellate review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Id. at 329, 387 S.E.2d at 796. The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

Code § 16.1-228(5) defines "abused or neglected child" as any child "[w]ho is without parental care or guardianship caused by the unreasonable absence or the mental or physical incapacity of the child's parent, guardian, legal custodian or other person standing in *loco parentis*."[3]

---

[3] In her opening brief, Datta argues that because Code § 16.1-228 does not define "mental incapacity," the definition of the term found in Code § 37.2-1000 applies to her case. Because Datta did not present this argument to the trial court, we will not address it. See Rule 5A:18.

From the record before us and in the absence of expert testimony, the trial court could have reasonably found that Datta suffered from a mental incapacity.

> While lay witnesses may testify to the attitude and demeanor of the defendant, "lay witnesses cannot express an opinion as to the existence of a particular mental disease or condition." Mullis v. Commonwealth, 3 Va. App. 564, 573, 351 S.E.2d 919, 925 (1987) (citing Phillips v. Stewart, 207 Va. 214, 220, 148 S.E.2d 784, 789 (1966)).

White v. Commonwealth, 46 Va. App. 123, 134, 616 S.E.2d 49, 54 (2005) (*en banc*).

No witness opined that Datta was suffering from a particular mental disease. Rather, the witnesses described her attitude toward others and her uncommon behavior. Several witnesses reported that Datta believed she was being followed or she spoke to persons who were not present. She exhibited aggressive behavior, which included threatening C.D.'s family and social workers. Furthermore, Datta had a history of mental hospitalization and she took psychiatric medications periodically. She refused to sign the appropriate release forms so a psychological evaluation could be performed, and she cooperated little with agencies attempting to assist her. From this evidence, the trial court could conclude Datta suffered from a mental incapacity.

In addition, the trial court could find Datta's mental incapacity prevented her from rendering appropriate parental care to C.D. Datta maintained an unclean and disorderly residence despite efforts by the social agencies to clean her home and to teach her how to maintain the home. She told social workers she lacked the energy to clean the residence, although she was not employed outside the home. On more than one occasion, social workers arrived at scheduled appointments and found that C.D.'s diaper was full and the room was cluttered with old food, dirty dishes, and soiled diapers. Datta often refused the assistance and services offered by social service agencies, and she was uncooperative with social workers. Even during supervised visits with C.D., Datta exhibited inappropriate behavior and appeared to be unable to comfort and care for the child. Moreover, Datta admitted that caring for C.D. had

exhausted her, she had lost her lease on the family's residence, and she had no clear plan for living arrangements and caring for C.D. when she was released from detention. From this evidence, the trial court could conclude C.D. was without parental care or guardianship within the meaning of Code § 16.1-228(5).

Accordingly, we affirm the decision of the trial court.

<u>Affirmed.</u>